BRETT SHUMATE
Assistant Attorney General, Civil Division
ELIZABETH J. SHAPIRO
Deputy Branch Director
JASON ALTABET
Trial Attorney
U.S. Department of Justice, Civil Division
1100 L Street, NW
Washington, D.C. 20005
Phone: (202) 305-0727; Fax: (202) 616-8470
Email: jason.k.altabet2@usdoj.gov

Attorneys for Defendant
U.S. Immigration and Customs Enforcement

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF SOUTHERN CALIFORNIA,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT,<br><br>Defendant. | No. 2:24-CV-9930-ODW-PVC<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**<br><br>(Concurrently filed with Separate Statement of Uncontroverted Facts, Declarations in Support, *Vaughn* Indices, and Proposed Judgment)<br><br>Hearing Date: January 12, 2026 at 1:30pm<br>Courtroom: 5D<br><br>Honorable Otis D. Wright, II<br>United States District Judge |

# TABLE OF CONTENTS

DESCRIPTION                                                                                    PAGE

**Contents**

TABLE OF AUTHORITIES ..................................................................................... iii

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT .................. vii

MEMORANDUM OF POINTS AND AUTHORITIES ................................................. 1

I.     INTRODUCTION ........................................................................................ 1

II.    BACKGROUND AND PROCEDURAL HISTORY ........................................ 1

       A.     Plaintiff's Five-Part FOIA Request ..................................................... 1

       B.     ICE's Search for and Production of Responsive Records ......................... 3

              1.     ICE's FOIA System ................................................................ 3

              2.     ICE's Search and Processing of Plaintiff's FOIA Request ............. 3

       C.     Summary of Documents Produced ........................................................ 5

       D.     Plaintiff's Suit, ICE's Reproductions, and the Parties' Cooperative
              Narrowing of the Issues ..................................................................... 6

III.   ARGUMENT ............................................................................................. 7

       A.     ICE's Processing and Search Were Reasonably Calculated to Uncover All
              Responsive Records ........................................................................... 8

       B.     Based on the Potentially Challenged Withholdings at Issue, ICE Properly
              Withheld Information under Exemption 4 ............................................ 10

              1.     The Information Redacted by ICE is Exempt under Exemption 4 ... 10

              2.     ICE Has Released All Reasonably Segregable Portions of the
                     Responsive Records ............................................................. 21

IV.    CONCLUSION .......................................................................................... 22

# TABLE OF AUTHORITIES

DESCRIPTION                                                                         PAGE

**Cases**

*Am. Small Bus. League v. U.S. Dep't of Def.*,
   588 U.S. 427 (2019) ...................................................................16, 17, 19, 21

*Food Mktg. Inst. v. Argus Leader Media*,
   588 U.S. 427 (2019) ...........................................................................11, 12, 16

*Berman v. CIA*,
   501 F.3d 1136 (9th Cir. 2007) ...................................................................10

*Bloomberg, L.P. v. Bd. of Governors of the Fed. Rsrv. Sys.*,
   601 F.3d 143 (2d Cir. 2010)........................................................................15

*Citizens Comm'n on Hum. Rights v. FDA*,
   45 F.3d 1325 (9th Cir. 1995) .......................................................................8

*Comstock Int'l v. Export-Import Bank*,
   464 F. Supp. 804 (D.C. Cir. 1979)..............................................................11

*Critical Mass Energy Project v. NRC*,
   975 F.2d 871 (D.C. Cir. 1992) ..............................................................10, 11

*Ctr. for Investigative Reporting v. U.S. Dep't of Lab.*,
   145 F.4th 1211 (9th Cir. 2025) ...................................................11, 13, 15, 16

*Detention Watch Network v. ICE*,
   215 F. Supp. 3d 256 (S.D.N.Y. 2016) .........................................................15

*Elec. Priv. Info. Ctr. v. Dep't of Homeland Sec.*,
   928 F. Supp. 2d 139 (D.D.C. 2013).............................................................14

*GC Micro Corp. v. Def. Logistics Agency*,
   33 F.3d 1109 (9th Cir. 1994), *overruled on other grounds*,
   *Animal Legal Def. Fund v. FDA*, 836 F.3d 987 (9th Cir. 2016)...................11

*GSA v. Benson*,
   415 F.2d 878 (1969)....................................................................................16

*Gulf & W. Indus. v. U.S.*,
  615 F.2d 527 (D.C. Cir. 1979) ................................................................ 14, 16

*Hamdan v. U.S. Dep't of Justice*,
  797 F.3d 759 (9th Cir. 2015) ................................................................ 22

*Hodes v. U.S. Dep't of Treasury*,
  342 F. Supp. 3d 166 (D.D.C. 2018) ................................................................ 15

*In Def. of Animals v. NIH*,
  543 F. Supp. 2d 83 (D.D.C. 2008) ................................................................ 14

*Iturralde v. Comptroller of Currency*,
  315 F.3d 311 (D.C. Cir. 2003) ................................................................ 8

*John Doe Agency v. John Doe Corp.*,
  493 U.S. 146 (1989) ................................................................ 7

*Johnson v. Exec. Off. for U.S. Att'ys*,
  310 F.3d 771 (D.C. Cir. 2002) ................................................................ 21

*Jud. Watch, Inc. v. Dep't of Com.*,
  375 F. Supp. 3d 93 (D.D.C. 2019) ................................................................ 18

*Lahr v. Nat'l Transp. Safety Bd.*,
  569 F.3d 964 (9th Cir. 2009) ................................................................ 7, 8

*Landfair v. U.S. Dep't of Army*,
  645 F. Supp. 325 (D.D.C. 1986) ................................................................ 11

*Lane v. Dep't of Interior*,
  523 F.3d 1128 (9th Cir. 2008) ................................................................ 10

*McDonnell Douglas Corp. v. Nat'l Aeronautics & Space Admin.*,
  180 F.3d 303 (D.C. Cir. 1999) ................................................................ 13

*Microsoft Corp. v. IRS*,
  No. C15-1605 RSM, 2023 WL 255831 (W.D. Wash. Jan. 18, 2023). ................................................................ 18

*Minier v. CIA*,
  88 F.3d 796 (9th Cir. 1996) ................................................................ 10

*Nation Magazine v. U.S. Customs Serv.*,

   71 F.3d 885 (D.C. Cir. 1995) ................................................................. 8

*Nat'l Parks and Conservation Ass'n v. Morton*,

   498 F.2d 765 (D.C. Cir. 1974) ............................................................... 11

*Occupational Safety & Health L. Project, PLLC v. U.S. Dep't of Lab.*,

   No. 1:21-CV-2028, 2022 WL 3444935 (D.D.C. Aug. 17, 2022) ............... 8, 12, 14, 15

*Oglesby v. U.S. Dep't of Army*,

   920 F.2d 57 (D.C. Cir. 1990) ................................................................. 8

*Pac. Architects & Eng'rs Inc. v. U.S. Dep't of State*,

   906 F.2d 1345 (9th Cir. 1990) ............................................................... 18

*Pac. Fisheries Inc. v. United States*,

   539 F.3d 1143 (9th Cir. 2008) ............................................................... 21, 22

*Pub. Citizen Health Rsch. Grp. v. Nat'l Insts. of Health*,

   209 F. Supp. 2d 37 (D.D.C. 2002) ......................................................... 14

*Rosenberg v. U.S. Dep't of Def.*,

   342 F. Supp. 3d 62 (D.D.C. 2018) ......................................................... 18

*SafeCard Servs. Inc. v. SEC*,

   926 F.2d 1197 (D.C. Cir. 1991) ............................................................. 8

*S. All. for Clean Energy v. U.S. Dep't of Energy*,

   853 F. Supp. 2d 60 (D.D.C. 2012) ......................................................... 14, 20

*U.S. Dep't of Justice v. Landano*,

   508 U.S. 165 (1993) ............................................................................. 16

*Vaughn v. Rosen*,

   484 F.2d 820 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974) ............... vii

*Willamette Indus., Inc. v. United States*,

   689 F.2d 865 (9th Cir. 1982) ................................................................. 21

*Yonemoto v. Dep't of Veterans Affairs*,

   686 F.3d 681 (9th Cir. 2012) ................................................................. vii

*Zemansky v. EPA*,

   767 F.2d 569 (9th Cir. 1985) ...........................................................................8

**Statutes**

5 U.S.C. § 552 ...................................................................................*passim*

18 U.S.C. § 1905 ...........................................................................................18

**Other Authorities**

Webster's Seventh New Collegiate Dictionary (1963) ......................................11

## NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

PLEASE TAKE NOTICE that, on January 12, 2026 at 1:30 p.m., or as soon thereafter as they may be heard, Defendant U.S. Immigration and Customs Enforcement will bring for hearing this motion for an order granting summary judgment in favor of the Defendant. This Motion will be made before the Honorable Otis D. Wright, II, United States District Judge, Courtroom 5D, Fifth Floor, located at First Street Federal Courthouse, 350 W. 1st Street, Los Angeles, CA 90012.

Defendant brings this motion under Federal Rule of Civil Procedure 56 on the grounds that the Defendant has fully complied with its obligations under the Freedom of Information Act ("FOIA") in response to Plaintiff's FOIA Request. Because Plaintiff cannot raise a genuine dispute of material fact and cannot prevail under FOIA on its claims Defendant is entitled to judgment as a matter of law.

This motion is made upon this Notice, the attached Memorandum of Points and Authorities, the declarations of Fernando Pineiro and Jason Altabet, the original *Vaughn* Index and modified version,[1] the Separate Statement of Uncontroverted Facts, and all pleadings, records, and other documents on file with the Court in this action, and upon such oral argument as may be presented at the hearing of this motion.

This motion is made following the conference of counsel pursuant to Local Rule 7-3 held on September 11, 2025. Counsel discussed three remaining issues for briefing: FOIA Exemption 4 for redacted final dollar amounts in contracts; FOIA Exemption 7(e) for redacted accounting codes; and whether an adequate search was conducted. Following the discussion at the conference, Defendant has decided to produce the accounting codes withheld under FOIA Exemption 7(e) without redactions. Defendant is also considering a discretionary release of some of the redacted final dollar amounts and,

---

[1] A *Vaughn* Index is a document that is prepared in litigation to justify withholding of information under the FOIA. The term arose from the case of *Vaughn v. Rosen*, 484 F.2d 820, 823-25 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974), in which such an index was required to determine the validity of the agency's withholdings. *See also Yonemoto v. Dep't of Veterans Affairs*, 686 F.3d 681, 688 (9th Cir. 2012) (describing requirements for *Vaughn* Index).

if it chooses to do so, will produce them to Plaintiff in advance of Plaintiff's opposition deadline.

Dated: September 22, 2025           BRETT SHUMATE
Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Branch Director

*/s/ Jason Altabet*
JASON ALTABET
*jason.k.altabet2@usdoj.gov*
U.S. Department of Justice, Civil Division
1100 L Street, NW
Washington, D.C. 20005
Telephone:(202) 305-0727
*Counsel for Defendant*

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Defendant U.S. Immigration and Customs Enforcement ("Defendant" or "ICE") has complied fully with its obligations under the Freedom of Information Act ("FOIA") with respect to Plaintiff's five-part FOIA Request. As a result, ICE is entitled to summary judgment.

First, ICE performed an adequate search for records. It found and produced thousands of PDF pages of records and over a dozen Excel records. ICE's enforcement division adequately identified the policy-related records that Plaintiff sought, including the relevant handbook. Additionally, ICE's acquisition team adequately searched its central database for the contracts and related acquisition materials sought by Plaintiff in its FOIA Request. All told, ICE has met its burden to demonstrate an adequate search.

Second, ICE appropriately withheld certain pricing details under FOIA's Exemption 4. *See* 5 U.S.C. § 552(b)(4). That exemption permits redaction of information in contracts that, if revealed, would violate the confidentiality of the Government's contractors. The contrary result would put at risk key commercial information that is held closely by these private entities.

ICE has cooperatively worked with Plaintiff throughout this process. As a result of those efforts, the Parties have been able to substantially narrow the issues to be decided in this summary judgment motion. ICE moves for summary judgment only to defend its adequate search and its redaction of critical commercial information received from outside the Government. All told, this Court should grant Defendant's motion.

### II.    BACKGROUND AND PROCEDURAL HISTORY

#### A.    Plaintiff's Five-Part FOIA Request

On August 15, 2024, Plaintiff submitted its FOIA Request to ICE, seeking the release of records relating to the implementation of ICE's air removal operations. D.'s Separate Statement of Uncontroverted Facts ("SSUF") ¶ 1. Specifically, the Request

sought the following records from the period of January 1, 2023 through the date of the search for:

1.  All ICE contracts in effect during any portion of the designated time period, including any addenda, attachments, and incorporated DOCUMENTS, regarding air transportation to execute removals, including flights leaving the United States and domestic flights to transport noncitizens in between detention sites to stage for removals. This includes, but is not limited to, the following contracts:

    a)  Award ID No. 70CDCR18FR0000002

    b)  Award ID No. 70CDCR23FR0000035

    c)  Award ID No. 70CDCR24FR0000024

2.  All ICE contracts, including addenda, attachments, and incorporated DOCUMENTS, for ground transportation to transfer noncitizens to airports for removal flights.

3.  DOCUMENTS sufficient to show the airfields ICE uses, or has access to, for removal flights.

4.  Memoranda, guidance, or any other DOCUMENTS regarding ICE's policies or procedures for staging noncitizens, including unaccompanied noncitizen children, for removal prior to flights.

5.  DOCUMENTS sufficient to show personnel required to be present on an aircraft to operate an ICE removal flight, including but not limited to, the flight crew, guards, and medical personnel.

SSUF ¶ 2; Compl. Ex. A ("FOIA Request") at 14, ECF No. 1-1.

In sum, the request sought contracts for operating removal flights and ground transportation to removal flights, and internal policies and procedures for staging, staffing, and handling flights. Plaintiff further clarified that its request "encompasses any contract in effect during that time period, *including* any new contracts awarded during that period if they were in effect during any of that time period." SSUF ¶ 3.

2

**B.    ICE's Search for and Production of Responsive Records**

1.    <u>ICE's FOIA System</u>

Upon receipt of a proper FOIA request, the ICE FOIA Office will identify which program offices within ICE are reasonably likely to possess records responsive to that request, if any, and task the relevant program offices with searches. SSUF ¶ 4. Once the ICE FOIA Office determines the appropriate program offices for a given request, it provides the points of contact within each of those program offices with a copy of the FOIA request and instructs them to conduct a search for responsive records. *Id.*

ICE employees maintain records in several ways. ICE program offices use various systems to maintain records, such as investigative files, records regarding the operation of ICE programs, and administrative records. SSUF ¶ 5. ICE employees may store electronic records on their individual computer hard drives, their program office's shared drive (if the office uses one), DVDs, CDs, and/or USB storage devices. *Id.* Additionally, all ICE employees have access to e-mail and ICE uses the Microsoft Outlook e-mail system. *Id.*

Records received by the ICE FOIA Office from the program office points of contact are assigned to a FOIA processor who determines whether the records are responsive to the FOIA request. SSUF ¶ 6. If the records are responsive, the FOIA processor will redact information pursuant to the FOIA or Privacy Act, as appropriate, while simultaneously ensuring that all reasonably segregated non-exempt information is released. *Id.*

2.    <u>ICE's Search and Processing of Plaintiff's FOIA Request</u>

Based on its review of Plaintiff's FOIA request and based on its subject matter expertise and knowledge of agency record systems, the ICE FOIA Office determined that ICE Office of Acquisition Management ("OAQ") and Enforcement and Removal Operations ("ERO"), were the offices likely to have responsive records. SSUF ¶ 7. The ICE FOIA Office instructed ERO and OAQ to conduct a comprehensive search for records and to provide all potentially responsive records located during that search to the

3

1    ICE FOIA Office for review and processing. SSUF ¶ 8.

2    *ERO's Search*

3    The mission of ERO is to identify, arrest, and remove noncitizens who present a
4    danger to national security or are a risk to public safety, as well as those who enter the
5    United States illegally or otherwise undermine the integrity of immigration laws and
6    border control efforts. SSUF ¶ 9. ERO transports removable noncitizens from point to
7    point, manages noncitizens in custody or in an alternative to detention program, and
8    removes individuals from the United States who have been ordered deported. *Id.*

9    Upon receipt of the FOIA request in this case and based on the nature of the
10    Plaintiff's FOIA Requests, the relevant ERO office for FOIA requests determined that
11    responsive records, to the extent any exist, would likely be maintained within ERO's
12    Removal Division. SSUF ¶ 10. ERO's Removal Division is responsible for coordinating
13    with the 25 ERO Field Offices to support case management and facilitate removals of
14    priority aliens from the United States. SSUF ¶ 11. The team, comprising ICE Air
15    Operations, International Operations, and Removal Management, coordinate the
16    complex coordination required to achieve this mission through the use of charter flights
17    and commercial airlines and to improve foreign government cooperation with ERO
18    removal efforts. *Id.*

19    Within ERO's Removal Division, the Unit Chief for ICE Air Operations
20    conducted a comprehensive search for responsive records. SSUF ¶ 12. The Unit Chief is
21    responsible for managing all individuals in the unit, including training, work
22    assignments and unit operations. *Id.* His search included using searching his email,
23    looking specifically for the "ICE Air Handbook" without applying a date range cutoff, as
24    well as searching his desktop, hard drive, and shared drive. *Id.* Drawing on his extensive
25    knowledge of available resources and the locations of relevant documents, he manually
26    reviewed files on his desktop and laptop. *Id.* The search resulted in 69 pages of
27    responsive records and two responsive Excel spreadsheets, which were processed and
28    released. SSUF ¶ 13.

4

*OAQ's Search*

The mission of OAQ is to manage ICE's enterprise-wide strategic approach to procurement, including from external Government commercial contractors. SSUF ¶ 14. OAQ's SharePoint site is centralized file management system, designed to organize, store, and manage procurement-related records, including contracts, amendments, performance work statements, and other administrative documentation. SSUF ¶ 15. OAQ's SharePoint site, is exclusively managed and utilized by OAQ personnel. *Id.*

After being tasked with Plaintiff's clarified FOIA request, the OAQ Acquisition Policy Office's FOIA point of contact retrieved the responsive records directly from OAQ's SharePoint site. *Id.* Within SharePoint, folders were specifically created for ICE Air contracts, as well as other types of contracts such as ground transportation. SSUF ¶ 16. These folders are organized to allow users to locate contracts based on criteria such as date ranges and contract types. *Id.*

The OAQ searcher utilized this system to locate responsive records by navigating through the relevant folders and identifying documents that matched Plaintiff's request. *Id.* The searcher identified that all responsive records for the relevant time periods, including the contracts requested and related records, were located within the folders searched, and the searcher had comprehensive access to all relevant records. *Id.*

OAQ found 3,568 pages of responsive records and 13 responsive Excel spreadsheets, which were forwarded to the ICE FOIA Office for review and processing and all were released as part of ICE's productions. SSUF ¶ 17.

## C.    Summary of Documents Produced

The records ICE produced from the searches at OAQ and ERO were varied. They included a range of operational and administrative documentation, including operational manuals, performance work statements, email communications, spreadsheets, contracts, amendments, subcontracting plans, and other attachments. SSUF ¶ 18. Collectively, these records provide insight into ICE's enforcement operations, logistical processes, and contractor-supported services. *Id.*

5

Relevant to Exemption 4, the records contain proprietary financial and commercial information submitted by ICE's contractors, such as CSI Aviation, Chapman Freeborn Airchartering, Spectrum Security Services, G4S Secure Solutions, and MVM Incorporated, for air charter and ground transportation services. SSUF ¶ 19. These documents provide detailed insights into proprietary pricing structures, cost breakdowns, labor rates, financial projections, and subcontracting plans that outline resource allocation to small businesses. *Id.*

D.   **Plaintiff's Suit, ICE's Reproductions, and the Parties' Cooperative Narrowing of the Issues**

On November 18, 2024, Plaintiff filed this action against Defendant United States Immigration and Customs Enforcement seeking timely release of certain agency records under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. Compl. ¶ 1, ECF No. 1. On March 18, 2025, the parties submitted their Joint Rule 26(f) Report. Joint Report, ECF No. 36. The Court subsequently issued a Scheduling Order with a briefing schedule for full production, Plaintiff's submission of potentially challenged withholdings, a *Vaughn* Index, and then summary judgment. Supp. Order Setting Briefing Schedule at 3, ECF No. 37.

After ICE's initial production of records, Plaintiff filed its letter containing potentially challenged withholdings. SSUF ¶ 22. On August 4th, ICE provided a reprocessed production lifting several categories of redactions that were part of Plaintiff's potentially challenged withholdings and a draft *Vaughn* index for the remaining potentially challenged withholdings. *Id.*; Ex. A to the Declaration of Jason Altabet, ACLU's First Potentially Challenged Withholdings Letter; Ex. B to the Declaration of Jason Altabet, *Vaughn* Index. To further narrow the issues, and in accordance with ICE's removal of redactions for a variety of material, Plaintiff provided a second letter with a narrower subset of potentially challenged withholdings. SSUF ¶ 23; Ex. C to the Declaration of Jason Altabet, ACLU's Second Potentially Challenged Withholdings Letter. Plaintiff also provided a Microsoft Excel version of the *Vaughn*

6

1    Index with notations next to the relevant potentially challenged redactions stating the
2    basis for Plaintiff's challenge. SSUF ¶ 23.

3        Following the Parties' meet and confer on September 11, 2025, ICE has decided
4    to release the challenged category of accounting codes withheld under Exemption 7(E).
5    SSUF ¶ 24. That leaves the only relevant withholdings as final dollar amounts withheld
6    under Exemption 4. ACLU's Second Potentially Challenged Withholdings Letter at 1-3.
7    To facilitate the Court's review, undersigned modified Plaintiff's Microsoft Excel
8    version of the *Vaughn* Index to include only the potentially challenged withholdings
9    under Exemption 4. SSUF ¶ 25; Ex. D to the Declaration of Jason Altabet, Modified
10   *Vaughn* Index.

11   **III.    ARGUMENT**

12       "FOIA was enacted to facilitate public access to Government documents." *Lahr v.*
13   *Nat'l Transp. Safety Bd.*, 569 F.3d 964, 973 (9th Cir. 2009) (citation omitted). The
14   statute represents a balance struck by Congress "between the right of the public to know
15   and the need of the Government to keep information in confidence." *John Doe Agency v.*
16   *John Doe Corp.*, 493 U.S. 146, 152 (1989) (citation omitted). Congress recognized "that
17   legitimate governmental and private interests could be harmed by release of certain types
18   of information and provided nine specific exemptions under which disclosure could be
19   refused." *FBI v. Abramson*, 456 U.S. 615, 621 (1982); Courts must give the exemptions
20   "meaningful reach and application." *John Doe*, 493 U.S. at 152.

21       ICE has satisfied its obligations under FOIA with respect to Plaintiff's FOIA
22   Request. ICE conducted searches that were reasonably calculated to locate all responsive
23   records. And ICE properly applied Exemption 4 to withhold information protected from
24   disclosure and released any reasonably segregable, nonexempt portion of the records.
25   *See* 5 U.S.C. § 552(b)(4). Those redactions were necessary and appropriate to protect
26   private parties' confidential commercial information. Because ICE conducted an
27   adequate search and has not improperly withheld any non-exempt responsive records,
28   there is no genuine issue as to any material fact and summary judgment should be

granted in Defendant's favor.

### A.    ICE's Processing and Search Were Reasonably Calculated to Uncover All Responsive Records

In FOIA cases on summary judgment, "[t]he adequacy of the agency's search is judged by a standard of reasonableness, construing the facts in the light most favorable to the requestor." *Citizens Comm'n on Hum. Rights v. FDA*, 45 F.3d 1325, 1328 (9th Cir. 1995) (*citing Zemansky v. EPA*, 767 F.2d 569, 571 (9th Cir. 1985)). An agency's search for records is considered "adequate" if it was conducted "using methods which can be reasonably expected to produce the information requested." *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995) (*quoting Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)); *Lahr*, 569 F.3d at 986; *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991) (the agency need only show that "the search was reasonably calculated to discover the requested documents, not whether it actually uncovered every document extant"). The "issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the search for those documents was adequate." *Citizens Comm'n on Human Rights*, 45 F.3d at 1328 (citation omitted); *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003) ("[T]he adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search.").

An agency's search does not need to be exhaustive, but rather, merely reasonable. *Oglesby*, 920 F.2d at 68. The agency need not search every record system, but must conduct a good faith, reasonable search of those systems of records likely to possess the requested records. *Id*.

ICE conducted an adequate search for records in response to Plaintiff's FOIA request. This includes determining the appropriate subcomponents for the FOIA Request and those subcomponents then appropriately searched and identified the relevant records.

First, ICE appropriately determined which subcomponents were likely to hold

8

responsive information based upon a careful review of the content of the request itself and the nature of the records sought. SSUF ¶ 7. ICE determined that ERO and OAQ were the offices most likely to maintain the records as the former constitutes the enforcement division that directs air removal operations and the latter is in charge of procurement. *Id*. ICE's FOIA Division subsequently shared the details of the FOIA Request and "instructed ERO and OAQ to conduct a comprehensive search for records and to provide all potentially responsive records." SSUF ¶ 8.

ERO's FOIA Office was tasked with determining which employees or divisions within ERO would be reasonably likely to have responsive records. SSUF ¶¶ 8-10. ERO's Removal Division, which supports case management and facilitates removals, was determined by ERO's FOIA Office to be the division likely to maintain relevant records. SSUF ¶¶ 10-11. ERO's Removal Division comprises ICE Air Operations, International Operations, and Removal Management. *Id.*

The Unit Chief for the ICE Air Operations group then comprehensively searched for records. SSUF ¶ 12. The Unit Chief searched emails, his desktop, hard drive, shared drive, and manually reviewed files. *Id.* He specifically searched for the "ICE Air Handbook" which was ultimately produced to Plaintiff. *Id.*; *Vaughn Index*. The Unit Chief located 69 pages of potentially responsive records and two potentially responsive Excel spreadsheets, all of which were processed and produced. SSUF ¶ 13. That the Unit Chief of the relevant group searched all relevant systems for the records requested strongly supports that ICE performed an adequate search.

OAQ's search was similarly reasonable and adequate. OAQ "manage[s] ICE's enterprise-wide strategic approach to procurement." SSUF ¶ 14. As a result, OAQ's Acquisition Policy Office, through its FOIA sub-office, directly searched for records relevant to Plaintiff's request. SSUF ¶ 15. OAQ maintains a SharePoint site which "serves as OAQ's centralized file management system, designed to organize, store, and manage procurement-related records, including contracts, amendments, performance work statements, and other administrative documentation." SSUF ¶¶ 15-16. The searcher

had comprehensive access to all relevant records and was able to identify them as they were organized into relevant folders for the contracts sought. SSUF ¶ 16.

The result of that search was 3,568 pages of potentially responsive records and 13 potentially responsive Excel spreadsheets. SSUF ¶ 17. After processing, ICE released all of the potentially responsive records. *Id.*

ICE has searched all locations and files reasonably likely to contain responsive records, and there is no basis for ICE to conclude that a search elsewhere would reasonably be expected to locate responsive records subject to FOIA. It has therefore met is search obligations in response to Plaintiff's FOIA Request.

## B.    Based on the Potentially Challenged Withholdings at Issue, ICE Properly Withheld Information under Exemption 4

Summary judgment may be granted to an agency in a FOIA case on the basis of information provided in affidavits, declarations, or a *Vaughn* index that describe "the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemptions, and show that the justifications are not controverted by contrary evidence in the record or by evidence of [agency] bad faith." *Berman v. CIA*, 501 F.3d 1136, 1140 (9th Cir. 2007). "If the affidavits contain reasonably detailed descriptions of the documents and allege facts sufficient to establish an exemption, the district court need look no further." *Lane v. Dep't of Interior*, 523 F.3d 1128, 1135-36 (9th Cir. 2008) (quotations and citations omitted). In evaluating an exemption claim, a court "must accord substantial weight to [the agency's] affidavits." *Minier v. CIA*, 88 F.3d 796, 800 (9th Cir. 1996) (quotation omitted).

### 1.    The Information Redacted by ICE is Exempt under Exemption 4

FOIA Exemption 4 applies to "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential." 5 U.S.C. § 552(b)(4). It ensures that federal agencies can obtain necessary and reliable commercial and financial information from outside the government. *Critical Mass Energy Project v.*

10

*NRC*, 975 F.2d 871, 877-78 (D.C. Cir. 1992) (citation omitted). It also serves Government interests by encouraging individuals to provide certain kinds of confidential information necessary for a well-functioning federal government. *Id.* at 873.

In line with the statutory language, the agency invoking Exemption 4 must demonstrate that the information is "(1) commercial and financial information, (2) obtained from a person or by the [G]overnment, (3) that is privileged or confidential." *GC Micro Corp. v. Def. Logistics Agency*, 33 F.3d 1109, 1112 (9th Cir. 1994), *overruled on other grounds*, *Animal Legal Def. Fund v. FDA*, 836 F.3d 987 (9th Cir. 2016) (en banc) (per curiam).

For the first prong, the word "commercial" in Exemption 4 should be given its ordinary meaning. *Ctr. for Investigative Reporting v. U.S. Dep't of Lab.*, 145 F.4th 1211, 1221 (9th Cir. 2025). That includes the sale of goods and services. *See id.* at 1218, 1221.

Second, the term "person" in Exemption 4 refers to a "wide range of entities, including corporations." *Landfair v. U.S. Dep't of Army*, 645 F. Supp. 325, 327-28 (D.D.C. 1986) (citing *Comstock Int'l v. Export-Import Bank*, 464 F. Supp. 804, 806 (D.C. Cir. 1979)); 5 U.S.C. § 551(2) (defining "person" to include "an individual, partnership, corporation, association, or public or private organization other than an agency").

Finally, information is "confidential" where it is "private" "secret" "or at least closely held." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 434 (2019) (quoting Webster's Seventh New Collegiate Dictionary 174 (1963)).[2] In the recent *Argus*

---

[2] Prior to 2019, many courts had followed the "competitive-harm" test only when assessing whether information submitted to the government involuntarily was "confidential." Under this test, set out in the D.C. Circuit's *National Parks* case, information submitted to the government involuntarily was considered confidential only if "disclosure of the information [was] likely to have either of the following effects: (1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." *Nat'l Parks and Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974). The United States Supreme Court expressly rejected that test in *Argus Leader* and decried the D.C. Circuit's effort "to afford the *same* statutory term two []radically different constructions" based merely on how the information had been submitted. 588 U.S. at 438. Therefore, the confidentiality analysis in pre-2019 cases applying the involuntary competitive-harm framework must be considered with caution.

*Leader* case, the Supreme Court ultimately determined that confidentiality requires the
"commercial or financial information [to be] both customarily and actually treated as
private by its owner." *Id.* at 440. The Court further noted, without deciding, that
information may also need to be "provided to the government under an assurance of
privacy." *Id.* It did not ultimately decide that question. *See id.* at 434.

At the very least, however, confidentiality requires treatment of information as
private by the owner of the information. And, in practice, courts have largely looked to
the assurance of privacy portion as "merely relevant" to the question of confidentiality,
rather than an iron-clad requirement. *See Occupational Safety & Health L. Project,
PLLC v. U.S. Dep't of Lab.*, No. 1:21-CV-2028, 2022 WL 3444935, at *7 n.5 (D.D.C.
Aug. 17, 2022) (summarizing the caselaw). Nonetheless, "[a]t least where commercial or
financial information is both customarily and actually treated as private by its owner and
provided to the government under an assurance of privacy, the information is
'confidential' within the meaning of Exemption 4." *Argus Leader*, 588 U.S. at 440.

Here, ICE withheld certain contract information. Specifically, ICE redacted
"pricing structures, labor rates, subcontracting plans, vendor's operational
methodologies, and detailed cost breakdowns for base year and option years." SSUF ¶
26. This included "sensitive financial details such as proposed rates, unit pricing per
flight or trip, total price increases, and specific monetary thresholds for subcontracting
plan requirements." *Id.*

Plaintiff challenges those redactions reflecting "[d]ollar amounts in final
contracts." ACLU's Second Potentially Challenged Withholdings Letter at 3. The most
obvious application of Plaintiff's identified category include:

- "staffing and non-staffing costs, mileage rates, and flight service rates" (or
  their equivalent for ground transportation);
- "[r]ate per hour, quantity, unit pricing per flight, as well as total price and
  price increases";
- "aircraft availability, flight hours, and ceiling cost amounts"; "ceiling

12

amounts for option year[s]";

- "detailed breakdown[s] of actual costs and figures for the base year and option years";
- personnel costs including quantities and unit pricing; and
- "[p]rojected contract revenue."

*See, e.g.*, Modified *Vaughn* Index, Rows 97, 99, 113, 153. ICE has sufficiently established all three prongs of Exemption 4 for these withholdings.

### *The Contractual Information is Commercial*

To start, the withholdings are "information that describes the goods and services being sold," and the information is thus properly understood as commercial. *Ctr. for Investigative Reporting*, 145 F.4th at 1218. The "dollar value of subcontracts" is routinely material that is held to be commercial. *Id.* at 1219 (characterizing *GC Micro Corp.*, 33 F.3d at 1111–12)). As is "line item price information." *Id.* (quoting *McDonnell Douglas Corp. v. Nat'l Aeronautics & Space Admin.*, 180 F.3d 303, 306 (D.C. Cir. 1999)). By challenging the dollar value of contracts through which ICE procures goods and services, Plaintiff seeks commercial material. The first prong of Exemption 4 is accordingly satisfied.

### *The Information in the Contracts Were Obtained from Persons: The Contractors*

The material is also obtained from a person. As ICE's declaration establishes, the costs, rates, quantities, projected contract revenue, and other pricing information were obtained from the contractors that ICE works with. "These documents provide detailed insights into proprietary pricing structures, cost breakdowns, labor rates, financial projections, and subcontracting plans that outline resource allocation to small businesses." SSUF ¶ 19. This information was specifically provided by the contractors during the contracting process and is not generated by ICE. SSUF ¶ 27. The information is then incorporated into the final agreements. SSUF ¶ 28.

That the information resides in contracts between ICE and private parties should be of no matter. While the Ninth Circuit has little caselaw on this inquiry, the D.C.

district courts routinely evaluate such questions. As those courts have explained, "[t]he key inquiry is who 'the source of the information [was] in the first instance,' and not necessarily who created the particular document." *Elec. Priv. Info. Ctr. v. Dep't of Homeland Sec.*, 928 F. Supp. 2d 139, 147 (D.D.C. 2013) (alteration in the original) (quoting *In Def. of Animals v. NIH*, 543 F. Supp. 2d 83, 103 (D.D.C. 2008)). So "portions of agency-created records may be exempt if they contain information that was either supplied by a person outside the government or that could permit others to 'extrapolate' such information." *S. All. for Clean Energy v. U.S. Dep't of Energy*, 853 F. Supp. 2d 60, 67 (D.D.C. 2012) (quoting *Gulf & W. Indus. v. U.S.*, 615 F.2d 527, 529–30 (D.C. Cir. 1979)). "In short: has the agency taken ingredients from the outside to create a new metaphorical dish, or instead offered tasting notes on another's pre-prepared meal?" *Occupational Safety & Health L. Project*, 2022 WL 3444935, at *5.

The redacted information falls on the proper side of that line. The contractors submitted the relevant cost and pricing information to ICE. SSUF ¶¶ 27-28. From there, ICE merely incorporated the information into the final contracts. *Id.* That suffices to make the information obtained by a person. *See S. All. for Clean Energy*, 853 F. Supp. 2d at 68 (explaining that Exemption 4 applies when outside "information [] is either repeated verbatim or slightly modified by the agency."); *accord In Def. of Animals*, 543 F. Supp. 2d at 102 ("[T]he fact that a financial amount is arrived at through negotiation with the government does not preclude a finding that a person is the source of such information."); *Pub. Citizen Health Rsch. Grp. v. Nat'l Insts. of Health*, 209 F. Supp. 2d 37, 44-45 (D.D.C. 2002) (concluding that although a licensee's final royalty rate was the result of negotiation with the agency, that did "not alter the fact that the licensee is the ultimate source of [the] information," inasmuch as the licensee "must provide the information in the first instance").

Plaintiff is likely to respond, as it did in its letters to ICE, by citing a Southern District of New York opinion in support of its position. *See* ACLU's Second Potentially Challenged Withholdings Letter at 3 (citing *Detention Watch Network v. ICE*, 215 F.

14

Supp. 3d 256, 263 (S.D.N.Y. 2016)); Modified *Vaughn* Index (same). But because that case relied on the Second Circuit's unique and extra-textualist test for whether information is obtained by a person, it is ultimately not persuasive.

The *Detention Watch Network* Court concluded that terms in a final government contract were not obtained from a person because the contract was a result of the government action that created the relevant document, even if redacted information came from outside of the government. 215 F. Supp. 3d at 262-63. But that conclusion stemmed from the Second Circuit's test, which holds that information contained in "the agency's own executive actions," is not "obtained from a person" for purposes of FOIA exemption 4. *Bloomberg, L.P. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 601 F.3d 143, 148 (2d Cir. 2010) (applying that rule to loan documents generated by the Federal Reserve using information from outside parties).

The Second Circuit's test, however, is at war with the text of Exemption 4. As the D.C. district courts have regularly held, document generated within an agency can still contain information "obtained from a person" if the document incorporates that information. *See, e.g.*, *Occupational Safety & Health L. Project*, 2022 WL 3444935, at *6. As a result, those district courts recognize *Bloomberg* and *Detention Watch Network* as unpersuasive and at odds with D.C. Circuit precedent. *Id.* (recognizing that the Second Circuit's test, as applied in *Detention Watch Network*, differs from the more straightforward test in the D.C. Circuit); *Hodes v. U.S. Dep't of Treasury*, 342 F. Supp. 3d 166, 171 n.4 (D.D.C. 2018) (recognizing that *Bloomberg*'s atextual test is not applied in the D.C. Circuit). That is because "the D.C. Circuit and its district courts rely on a test rooted in the statute's simple text: 'obtained from a person.'" *Occupational Safety & Health L. Project*, 2022 WL 3444935, at *6 (quoting 5 U.S.C. § 552(b)(4)).

This Court should follow the D.C. Circuit's straightforward and textually grounded inquiry. As the Ninth Circuit has recently emphasized, any requirements "impose[d]" by Exemption 4 must flow directly from "the text of Exemption 4." *Ctr. for Investigative Reporting*, 145 F.4th at 1221. Textually, then, the proper question is

15

whether "release of this information would disclose data supplied to the government from a person outside the government." *See Gulf & W. Indus.*, 615 F.2d at 530. And here, as established by the agency declaration and accompanying Modified *Vaughn* Index, the information in the contracts was obtained from contractors outside the agency. SSUF ¶¶ 27-28. That suffices for the second prong.

> *The Withheld Pricing and Cost Information is Confidential to the Contractors*

Lastly, the withheld information, comprising sensitive price and cost information, is confidential for purposes of Exemption 4.

"At least where commercial or financial information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy, the information is 'confidential' within the meaning of Exemption 4." *Argus Leader*, 588 U.S. at 440. This is not a high bar. *See, e.g.*, *Am. Small Bus. League v. U.S. Dep't of Def.*, 411 F. Supp. 3d 824, 832 (N.D. Cal. 2019) ("Under *Food Marketing*, it appears that defendants need merely invoke . . . 'customarily and actually kept confidential'— to prevail."). Moreover, the assurance of confidentiality portion is generally understood to be "merely relevant" in this inquiry rather than a necessary requirement. *Occupational Safety & Health L. Project*, 2022 WL 3444935, at *7 n.5. Nor need the assurance be express. *Argus Leader*, 588 U.S. at 435 (positively citing a Ninth Circuit case stating that "Exemption 4 would 'protect information that a private individual wishes to keep confidential for his own purposes, but reveals to the government under the express or <u>implied</u> promise' of confidentiality" (emphasis added) (quoting *GSA v. Benson*, 415 F.2d 878, 881 (1969)). And "'an implied assurance of confidentiality' may be reasonably inferred based on certain 'generic circumstances'" *Am. Small Bus. League*, 411 F. Supp. 3d at 835 (quoting *U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 179 (1993)).

The challenged pricing and cost information satisfy these confidentiality requirements.

First, the agency declaration and Modified *Vaughn* Index explain that the

contractors treat the specific pricing and cost information withheld in this matter as private. SSUF ¶ 29-35; *see also, e.g.*, Modified *Vaughn* Index at Rows 1, 3-15, 102-11 ("CSI customarily treats the pricing structure of their contracts as confidential. Further, ICE does not customarily release this type of pricing information, belonging to a private company, to the public."); *id.* at Rows 113, 126, 151, 161 ("[T]he [actual costs and figures] information is customarily treated as private by the contractor and is provided to the government under an assurance of confidentiality[] . . . contractors may be less willing to disclose their proprietary information if they know it will be publicly disclosed."). This information is consistently treated as confidential by the submitters. SSUF ¶ 29. ICE knows this because submitters protect that information through, for example, marking documents, restricting access to the information within their organizations, and explicitly requesting that ICE not disclose it publicly. SSUF ¶¶ 29, 31-32. Additionally, ICE notified submitters that their propriety information was implicated in this suit. SSUF ¶ 33. "Those contractors who responded confirmed that they treat the information as confidential and proprietary" and they further requested that ICE not disclose the information. SSUF ¶¶ 33-35. This further reinforces the non-public nature of the withheld information.

Second, implied and explicit assurances of confidentiality support the finding that the withheld information is confidential. The information provided and withheld was submitted "under an express or implied assurance of confidentiality." SSUF ¶ 30; Modified *Vaughn* Index (detailing examples). The majority of submissions included clear "confidential and proprietary" markings. SSUF ¶ 32. ICE also historically treats the information as private, SSUF ¶¶ 30, 33-35, establishing as a matter of "generic circumstances," that the information is submitted under an implied assurance of confidentiality. *See Am. Small Bus. League*, 411 F. Supp. 3d at 835. For example, the Procurement Integrity Act and the Federal Acquisition Regulation impose an express obligation on ICE to keep proprietary information in contractor records confidential. SSUF ¶ 30. And upon ICE's notification to contractors that their propriety information

was implicated in this suit, several objected and cited to promises of confidentiality from ICE during the procurement process, reinforcing the expectation among contractors that the information would remain protected. SSUF ¶¶ 33-35.

Lastly, this confidentiality analysis is in accord with what courts in the Ninth Circuit have held. For example, the District Court for the Western District of Washington has held that Exemption 4 properly covers "information provided by various contractors before, during, or after the contract such as contractors' proposed, prospective, or actual billing schedules, as well as information on invoice documents reflecting amounts billed [and] hours worked." *Microsoft Corp. v. IRS*, No. C15-1605 RSM, 2023 WL 255831, at *7 (W.D. Wash. Jan. 18, 2023). That is precisely the kind of information Plaintiff seeks.

### *Release of this Cost and Pricing Information Would Inflict Foreseeable Harm*

In 2016, Congress amended FOIA to add the "foreseeable harm" standard in which agencies "shall withhold information" under FOIA "only if the agency reasonably foresees that disclosure would harm an interest protected by an exemption" or "disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A)(i). Under that standard "'an agency must release a record—even if it falls within a FOIA exemption—if releasing the record would not reasonably harm an exemption—protected interest' and if the law does not prohibit the disclosure." *Jud. Watch, Inc. v. Dep't of Com.*, 375 F. Supp. 3d 93, 98 (D.D.C. 2019) (quoting *Rosenberg v. U.S. Dep't of Def.*, 342 F. Supp. 3d 62, 72 (D.D.C. 2018)).

First, the foreseeable harm standard does not apply where disclosure is prohibited by law. And courts, including the Ninth Circuit, have recognized that the Trade Secret Act ("TSA"), 18 U.S.C. § 1905, is co-extensive with the entirety of Exemption 4. *See Pac. Architects & Eng'rs Inc. v. U.S. Dep't of State*, 906 F.2d 1345, 1347 (9th Cir. 1990). Thus, foreseeable harm analysis should not apply as the TSA independently forbids disclosure.

Next, if the Court turns to foreseeable harm analysis, the withholdings satisfy that

test. District courts have held, for Exemption 4, that the protected interest is confidentiality. *See, e.g.*, *Am. Small Bus. League*, 411 F. Supp. 3d at 836. Since "[d]isclosure would necessarily destroy the private nature of the information, no matter the circumstance" any information that satisfies Exemption 4 satisfies the foreseeable harm standard. *See id.* That ultimately makes sense—the textual reach of Exemption 4 is all confidential commercial information submitted to the Government. Given that the very core of Exemption 4 is protecting private commercial information that is closely held, any disclosure would necessarily pierce an exemption-protected interest.

Even if this court disagrees with those points, the foreseeable harm standard is still satisfied. Beyond confidentiality itself, the exception ensures that the Government can obtain necessary information as well as incentivizing the participation of private parties in Government submission processes. Here, public disclosure of this information could discourage contractors from fully participating in submissions for future government contracts due to concerns that their proprietary information will be exposed to competitors or the general public. SSUF ¶ 36. If contractors are unwilling to provide detailed pricing data due to concerns about public disclosure, ICE may face challenges in securing competitive pricing and ensuring cost-effective procurement. *Id.* Moreover, application of Exemption 4 ensures the interests of the submitting contractors are protected. SSUF ¶ 37. In sum, disclosure would harm the private entities and compromise the integrity of the procurement process. Those are sufficient foreseeable harms.

### *The Non-Dollar Amount Contract Information is Also Properly Withheld*

Plaintiff also identified in its spreadsheet certain Exemption 4 withholdings tangential or unrelated to final pricing, such as:

- subcontracting information regarding
  - "[e]stimated total dollars planned to be subcontracted to Small Business, Small Disadvantaged Business (including ANC or Indian Tribe), Service-Disabled Veteran-Owned Small Business, Woman-

Owned Small Business, and HUBZone Small Businesses for year one and [option years]";

- o "[i]nformation regarding specific small business classifications and the status of [the contractor's] participation in the DHS Mentor-Protégé Agreements"

- o "efforts to identify subcontracting opportunities, [the contractor's] approach to meeting subcontracting goals, and general strategies for vendor selection";

- o "[s]pecific monetary thresholds for subcontracting plan requirements";

- "[s]pecific examples of commodities included in [the contractor's] daily purchase decisions"; and

- "minimum and maximum quantities the Government will acquire."

*See, e.g.*, Modified *Vaughn* Index, Rows 154-59, 162.

It is not clear that Plaintiff seeks to contest these withholdings given that they are not final dollar amounts in contracts of the kind described earlier. *See* ACLU's Second Potentially Challenged Withholdings Letter at 3. However, if Plaintiff does seek to challenge these withholdings, they meet all the relevant requirements.

First, they are all commercial for the same reason as the earlier cost and pricing information. They are contracts through which ICE procures goods and services.

Second, like the earlier examples, these categories of information are obtained from a person. SSUF ¶¶ 27-28; Modified *Vaughn* Index. All these portions thus "contain information that was either supplied by a person outside the government or that could permit others to extrapolate such information." *S. All. for Clean Energy*, 853 F. Supp. 2d at 67 (citation modified).

Third, the information is confidential. It is kept private by the contractors. SSUF ¶ 29; Modified *Vaughn* Index. And it is submitted through an explicit or implied assurance of confidentiality. SSUF ¶¶ 29, 31, 33. Lastly, the information satisfies foreseeable harm

20

1   for the same reasons that the earlier examples merited protected. SSUF ¶ 36-37.

2       Courts agree, especially for subcontractor-related information. For example, the

3   Northern District of California has found Exemption 4 to properly cover "comprehensive

4   subcontracting plans [that contractors] annually submitted to the government contained

5   the companies' small-business subcontracting goals, in terms of percentage categories

6   and actual dollars spent, for that particular year." *Am. Small Bus. League*, 411 F. Supp.

7   3d at 830.

8                                          * * *

9       All told, ICE disclosed a substantial amount of information to Plaintiff and

10  properly withheld a subset of certain records containing information submitted by its

11  contractors. The information is confidential and commercial, and ICE is properly

12  shielding that small portion of the total production from disclosure. It has met its burden

13  and should be awarded summary judgment on Exemption 4.

14          2.   <u>ICE Has Released All Reasonably Segregable Portions of the</u>

15               <u>Responsive Records</u>

16      Under FOIA, "[a]ny reasonably segregable portion of a record shall be provided to

17  any person requesting such record after deletion of the portions which are exempt . . . ."

18  5 U.S.C. § 552(b)(9). The agency need not disclose non-exempt portions of a document

19  if "they are inextricably intertwined with exempt portions such that the excision of

20  exempt information would impose significant costs on the agency and produce an edited

21  document with little informational value." *Willamette Indus., Inc. v. United States*, 689

22  F.2d 865, 867-68 (9th Cir. 1982) (citation modified). The agency must provide a

23  "detailed justification" for its claim of non-segregability, but "is not required to provide

24  so much detail that the exempt material would be effectively disclosed." *Johnson v.*

25  *Exec. Off. for U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002) (citation omitted). "The

26  burden is on the agency to establish that all reasonably segregable portions of a

27  document have been segregated and disclosed." *Pac. Fisheries, Inc. v. United States*, 539

28  F.3d 1143, 1148 (9th Cir. 2008) (citing 5 U.S.C. § 552(a)(4)(B), (b)). "The agency can

meet its burden by offering an affidavit with reasonably detailed descriptions of the withheld portions of the documents and alleging facts sufficient to establish an exemption." *Pac. Fisheries*, 539 F.3d at 1148; *see Hamdan v. U.S. Dep't of Just.*, 797 F.3d 759, 779 (9th Cir. 2015).

Here, ICE personnel conducted a careful page-by-page, line-by-line review of all records and disclosed all reasonably segregable information. SSUF ¶¶ 38-39. This is evinced by ICE's choice to disclosure multiple categories of potentially challenged withholdings, including following the meet and confer prior to this motion. SSUF ¶¶ 23-24.

ICE has complied with its obligation to segregate and release all reasonably segregable, non-exempt information related to Plaintiff's Request. ICE has diligently worked to provide Plaintiff with all reasonably segregable information. It has therefore met its burden.

## IV.    CONCLUSION

For the reasons discussed above, ICE requests that the Court grant this motion and enter judgment in its favor.


Dated: September 22, 2025          BRETT SHUMATE
                                   Assistant Attorney General

                                   ELIZABETH J. SHAPIRO
                                   Deputy Branch Director

                                    */s/ Jason Altabet*
                                   JASON ALTABET
                                   *jason.k.altabet2@usdoj.gov*
                                   U.S. Department of Justice, Civil Division
                                   1100 L Street, NW
                                   Washington, D.C. 20005
                                   Telephone:(202) 305-0727
                                   *Counsel for Defendant*

## **Local Rule 11-6.2 Certificate of Compliance**

The undersigned counsel of record certifies that this memorandum contains 6935 words, which complies with the word limit set by L.R. 11-6.1 and the limit set by this Court's general motion requirements.


Dated: September 22, 2025                     /s/ *Jason Altabet*

                                        JASON ALTABET
                                        Trial Attorney